## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

_____

ENVIRONMENT AMERICA, INC.,
d/b/a ENVIRONMENT RHODE ISLAND**,**

     Plaintiff,

v.

KENYON INDUSTRIES, INC., d/b/a
BROOKWOOD FINISHING and
BROOKWOOD COMPANIES INCORPORATED,

     Defendants.

_____

Civil No.


**COMPLAINT**

## INTRODUCTION

1.     This is a citizen enforcement suit brought by a non-profit environmental organization, Environment Rhode Island, on behalf of its individual members, against Kenyon Industries, Inc., d/b/a Brookwood Finishing ("Kenyon"), and its parent company, Brookwood Companies Incorporated ("BCI"), to redress and prevent ongoing violations of the federal Clean Water Act ("CWA" or "Act") that pollute and adversely affect the Pawcatuck River in southern Rhode Island.

2.     Defendant Kenyon is a Rhode Island corporation operating a textile finishing mill ("Kenyon Mill" or "Facility") located in the village of Kenyon within the Town of Richmond, Rhode Island.  Kenyon is a wholly owned subsidiary of Defendant BCI.

3.     Kenyon scours, dyes, finishes, prints, and coats woven synthetic fabrics at the Facility.  These fabrics are used in a variety of markets, such as military, luggage and knapsacks,

flag and banner, apparel, industrial, and sailcloth. The Facility also houses a research and development lab.

4. Wastewater is generated at the Facility. Kenyon discharges wastewater from the Facility into the Pawcatuck River.

5. The Pawcatuck River has been designated by Congress as a Wild and Scenic River, at 16 U.S.C. §1274(a)(226), which means that the river has "outstandingly remarkable values," including its ecological, scenic, recreational, and cultural value. The national designation is intended to protect and enhance these values, and to preserve the Pawcatuck River in its free-flowing condition for the enjoyment of present and future generations.

6. A 2.16-mile segment of the Pawcatuck River, extending from the Kenyon wastewater discharge point downstream to the Carolina Mill Pond in Carolina, is on the State of Rhode Island List of Impaired Waters (a list created under the mandate of CWA Section 303(d), 33 U.S.C. § 1313(d)).

7. That segment of the river is listed as "impaired" because it does not meet water quality standards relating to toxicity, meaning it cannot adequately support fish, other aquatic life, and wildlife.

8. Dischargers of industrial wastewater, like Kenyon, must comply with permits issued under the National Pollutant Discharge Elimination System ("NPDES"), a federal program established in Section 402 of the Clean Water Act, 33 U.S.C. § 1342. In Rhode Island, the NPDES program is administered by Rhode Island Department of Environmental Management ("RI DEM") as the Rhode Island Pollutant Discharge Elimination System ("RIPDES") program, subject to the oversight and ultimate authority of the U.S. Environmental Protection Agency.

9.     A RIPDES wastewater discharge permit, which is required by federal law to meet certain federal criteria, contains limits on the discharge of allowable pollutants, and contains pollutant monitoring requirements. The discharge of any pollutant in violation of a RIPDES permit is prohibited by Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

10.     Kenyon has been issued a RIPDES permit (Number RI0000191) for the Facility.

11.     Kenyon has violated, and continues to violate, this RIPDES permit. A violation of a RIPDES permit is a violation of the CWA.

12.     Wastewater discharged by Kenyon into the Pawcatuck has consistently violated the daily maximum and monthly average limits for copper, a toxic pollutant, contained in the Facility's RIPDES permit. Kenyon's wastewater has also repeatedly exceeded the permit's limits for whole effluent toxicity.

13.     Kenyon's history of RIPDES permit violations extends back well before the five-year statute of limitations period in this case, which began on June 23, 2017, five years prior to the service of the statutorily required pre-suit notice. The wastewater discharged by Kenyon into the Pawcatuck River has contained concentrations of copper in excess of Kenyon's permitted limits each and every month since at least November 2010.

14.     Kenyon will continue to violate its RIPDES permit after the date this Complaint is filed.

15.     Plaintiff intends this action to encompass post-Complaint violations of the types alleged herein.

16.     Plaintiff's members place a high value on the health and quality of the Pawcatuck River and its surroundings. They are concerned about the impacts of the pollutants discharged

by Kenyon on the health and safety of the river and their local environment, and their use and enjoyment of the river is adversely affected by the CWA violations detailed herein.

17.     Neither the federal government nor the state of Rhode Island has taken action sufficient to prevent Kenyon from violating the Act in the past, or to prevent future violations.

## CITIZEN ENFORCEMENT UNDER THE CLEAN WATER ACT

18.     The objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any pollutant from a point source into navigable waters except as authorized by a NPDES permit applicable to that point source. 33 U.S.C. §§ 1311(a) and 1342.

19.     The CWA authorizes citizens to commence an enforcement action in federal court against any person who is in violation of "an effluent standard or limitation." 33 U.S.C. § 1365(a).  "Effluent standard or limitation" includes any condition or requirement of an NPDES (or, as in this case, RIPDES) permit. 33 U.S.C. § 1365(f).

20.     The CWA authorizes the plaintiffs in such citizen enforcement suits to seek injunctive relief, civil penalties payable to the United States Treasury, and their costs of litigation.

21.     Kenyon is required by its RIPDES permit to monitor its wastewater effluent, and to submit the monitoring results to RI DEM monthly, on forms called "discharge monitoring reports" ("DMRs").  DMRs are signed by a company official under the penalty of perjury. Under the CWA, DMRs are publicly available.

22.     DMRs submitted by Kenyon to RI DEM contain information on the concentrations of certain pollutants in the Facility's wastewater, including copper.

23.     DMRs submitted by Kenyon to RI DEM contain information on the toxicity of the Facility's wastewater as measured by quarterly whole effluent toxicity tests prescribed by RI DEM.

24.     The discharge monitoring reports Kenyon has submitted to RI DEM are conclusive evidence of the results reported in those DMRs.

## PARTIES

**Environment Rhode Island**

25.     Plaintiff Environment America, Inc., is a Colorado non-profit corporation with over 270,000 dues-paying members nationwide.

26.     Environment America does business in Rhode Island as Environment Rhode Island and will be referred to subsequently herein as Environment Rhode Island.

27.     Environment Rhode Island is a "person" within the meaning of 33 U.S.C. § 1362(5) of the CWA, which defines "person" to include "corporation."

28.     Environment Rhode Island has just under 300 dues-paying members in Rhode Island.

29.     Environment Rhode Island advocates for clean air, clean water, and the preservation of Rhode Island's natural resources.

30.     Among other activities in pursuit of these goals, Environment Rhode Island researches and distributes analytical reports on environmental issues, advocates before legislative and administrative bodies, conducts public education and membership recruitment campaigns (door to door, over the phone, via social media, and by direct mail), and pursues public interest litigation on behalf of its members.

31.     Environment Rhode Island has members who live, own homes, and/or spend time near the Facility and/or the Pawcatuck River, who participate in recreational activities in, on, or

near the Pawcatuck River, both upstream and downstream of the Facility, and who derive aesthetic enjoyment from the river and its environs.

32.     Environment Rhode Island brings this suit on behalf of its members who are adversely affected by the Facility's violations of discharge limits for copper and whole effluent toxicity.  These violations have deleterious impacts on Environment Rhode Island's members' use and enjoyment of the Pawcatuck River and of the environment in which members live, work, and recreate.  They are reasonably concerned that these violations are harming fish and other aquatic life, and this lessens their enjoyment of the river.  Some of these members use the river less than they otherwise would because of these violations.

**Kenyon Industries, Inc., d/b/a Brookwood Finishing and Brookwood Companies Incorporated**

33.     Kenyon is a corporation, incorporated in Delaware and with its principal office in New York, New York.

34.     As a corporation, Kenyon is a "person" within the meaning of 33 U.S.C. § 1362(5) of the CWA.

35.     Kenyon prints, dyes, and coats fabrics for the United States military and for commercial customers at its Rhode Island Facility.

36.     Kenyon operates the Facility.

37.     Kenyon owns the Facility.

38.     BCI is a corporation, incorporated in Delaware and with its principal office in New York, New York.

39.     As a corporation, BCI is a "person" within the meaning of 33 U.S.C. § 1362(5) of the CWA.

40. BCI is an integrated textile firm that develops and produces fabrics and related products through specialized finishing, treating and coating processes.

41. BCI has two principal wholly owned subsidiaries: Kenyon, which operates the Facility at issue, and a separate fabric laminating operation in Connecticut.

42. BCI owns the Facility.

43. BCI is a wholly owned subsidiary of Hallwood, a privately held investment firm based in Monaco and Dallas, Texas.

44. Hallwood was publicly traded as Hallwood Group Incorporated until it was taken private in or around 2015. Hallwood's final Form 10-K identified BCI as "one of the largest coaters of woven nylons in the United States," and reported annual BCI sales of approximately $128 million, $130 million, and $139 million in 2012, 2013, and 2014, respectively.

45. Hallwood's website indicates BCI currently maintains annual sales of over $130 million.

## JURISDICTION, VENUE, AND NOTICE

46. This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a)(1) (the CWA "citizen suit" provision) and 28 U.S.C. § 1331.

47. Venue lies in this District under 33. U.S.C. § 1365(c)(1) because the Facility is located within this District.

48. Pursuant to 28 U.S.C. § 2201(a), this Court may issue a declaratory judgment determining that Kenyon has violated its permit and determining the number of days of violations Kenyon has committed.

49.     On June 23, 2022, counsel for Environment Rhode Island mailed a letter (the "Notice Letter," a copy of which is attached as **Exhibit 1** and is incorporated by reference herein) by certified mail, return receipt requested, to the following:

a.  Regina G. Marquart, President of Kenyon Industries, Inc., and John Donlon, EH&S Director of Kenyon Industries, Inc.  Ms. Marquart and Mr. Donlon received the Notice Letter.  Copies of return receipts for Ms. Marquart and Mr. Donlon are in **Exhibit 2**, attached hereto.

b.  Corporation Service Company, registered agent for Kenyon Industries, Inc. Corporation Service Company received the Notice Letter.  A copy of the return receipt for Corporation Service Company is attached in **Exhibit 2**.

c.  Frank Montie, Chief Executive Officer of Brookwood Companies Incorporated.  Mr. Montie received the Notice Letter.  A copy of the return receipt for Mr. Montie is attached in **Exhibit 2**.

d.  Corporation Service Company, registered agent for Brookwood Companies Incorporated.  Corporation Service Company received the Notice Letter.  A copy of the return receipt for Corporation Service Company is attached in **Exhibit 2**.

e.  The Administrator of the U.S. Environmental Protection Agency ("EPA") and the Regional Administrator of EPA Region 1.  The Administrator and Region 1 Administrator received the Notice Letter.  Copies of the return receipts for the Administrator and Region 1 Administrator are attached in **Exhibit 2**.

f.  The Governor of Rhode Island.  The Governor received the Notice Letter.  A copy of the return receipt for the Governor is attached in **Exhibit 2**.

g. The Acting Director of RI DEM. The Acting Director received the Notice Letter. A copy of the return receipt for the Acting Director is attached in **Exhibit 2**.

50. The Notice Letter satisfies the pre-suit notice requirements of 33 U.S.C. § 1365(b)(1)(A) of the CWA.

51. Environment Rhode Island filed this Complaint more than 60 days after the mailing of the Notice Letter, pursuant to the requirements of 33 U.S.C. § 1365(b)(1)(A) of the CWA.

52. Environment Rhode Island will serve a copy of this Complaint on the U.S. Attorney General and the Administrator of the EPA, pursuant to 33 U.S.C. § 1365(c)(3).

53. As of the date of the filing of this Complaint, neither U.S. EPA nor RI DEM has commenced or is diligently prosecuting a civil or criminal action against Kenyon in a court of the United States or a state to require compliance with any of the effluent standards or limitations that Plaintiffs allege are being violated at the Facility.

54. As of the date of the service of the Notice Letter, neither U.S. EPA nor RI DEM had begun an administrative action to penalize Kenyon for any of the violations set forth in the Notice Letter.

## THE FACILITY

55. Kenyon's operations are housed in a mill located at 36 Sherman Avenue in the Village of Kenyon within Richmond, Rhode Island, near its border with Charlestown, Rhode Island.

56.     The Facility contains over 300,000 square feet of "cutting edge fabric processing technology" and houses "unprecedented research and development equipment," according to Kenyon.

57.     The fabric processing performed by Kenyon at the Facility generates industrial wastewater.

58.     Kenyon discharges approximately 115 million gallons of wastewater into the Pawcatuck River each year, an average of roughly one third of a million gallons per day.

59.     The wastewater discharged into the Pawcatuck is also known as the Facility's "effluent."

60.     Wastewater generated at the Facility is treated before it is discharged into the Pawcatuck through Outfall 001A.

61.     Outfall 001A is a "point source" as defined in 33 U.S.C. § 1362(14).

62.     When fully operational, treatment of Kenyon's wastewater is accomplished using an activated sludge secondary treatment process, incorporating an aeration basin, a coagulation tank and feed system, a polymer tank and feed system, a flocculation tank, two clarifiers, a polishing pond, a sludge conditioning tank, and a filter press.

**THE FACILITY'S RIPDES PERMIT**

63.     Once issued, NPDES (and RIPDES) permits are revised periodically thereafter. The current version of RIPDES Permit No. RI0000191, which governs wastewater discharges from the Facility to the Pawcatuck River, was issued on February 25, 2022, and went into effect on April 1, 2022 ("2022 Permit").  A copy of the 2022 Permit is attached as **Exhibit 3**.

64.     The previous version of RIPDES Permit No. RI0000191 was issued on July 20, 2010, and went into effect on October 1, 2010 ("2010 Permit").  A copy of the 2010 Permit is attached as **Exhibit 4**.

65.     Both the 2010 and 2022 versions of the Permit state, in Section II(a): "The permittee must comply with all conditions of this permit.  Any permit noncompliance constitutes a violation of Chapter 46-12 of the Rhode Island General Laws and the Clean Water Act (CWA) and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application."

66.     Both of these versions of the Permit state, in Section II(a)(2), that any person who violates a permit condition is subject to monetary penalties for each day of violation of a permit condition.

67.     Both of these versions of the Permit state, in Section II(c): "It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit."

68.     Both of these versions of the Permit state, in Section II(d): "The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment."

69.     Both of these versions of the Permit, in Section I(A)(8), set effluent limitations and monitoring requirements for wastewater discharges from Outfall 001A to the Pawcatuck River.

## COUNT I:  COPPER VIOLATIONS

70.     Paragraphs 1 through 69 are re-alleged and incorporated by reference herein.

71.     From October 1, 2010, through March 31, 2022, Section I(A)(8) of Kenyon's RIPDES Permit prohibited Kenyon from discharging wastewater containing copper in concentrations that exceeded: (1) 83.9 micrograms of copper per liter of wastewater (or "ug/l") on any given day (called a "maximum daily" or "daily max." limit), or (2) 59.6 ug/l as an average of measurements taken over the course of a month (called a "monthly average" limit).

72.     During the period from June 23, 2017 (the beginning of the statute of limitations period for this case) through March 31, 2022, Kenyon violated these maximum daily and monthly average copper limits every month of every year.

73.     Beginning on April 1, 2022, Section I(A)(8) of Kenyon's RIPDES permit tightened the effluent limits for copper by specifying: (1) a maximum allowable daily concentration of 54.28 ug/l, and (2) a maximum allowable monthly average concentration of 39.19 ug/l.

74.     Beginning in April 2022, Kenyon has violated these revised daily maximum and monthly average copper limits in every month for which Kenyon's monitoring data are publicly available.

75.     These revised copper limits are more stringent than the copper limits in the 2010 Permit.

76.     The copper limits in Kenyon's RIPDES permit are water quality-based limits.  As required by the CWA, Kenyon's copper limits were set by RI DEM at a level designed to achieve compliance with state water quality standards for the Pawcatuck River.

77.     The more stringent copper limits in the 2022 Permit reflect RI DEM's determination that the flow of the Pawcatuck River has decreased, and thus that the river can

tolerate less copper in Kenyon's wastewater now than when RI DEM set copper limits in the 2010 Permit.

78.     Each time Kenyon exceeds one of the copper limits in its RIPDES permit, it violates the CWA.

79.     Kenyon does not operate in a manner that allows the company to achieve compliance with its daily maximum or monthly average copper limits.  In the five years preceding the Notice Letter, Kenyon violated its applicable daily maximum and monthly average copper limits in each of the 58 months for which the monthly DMRs available from RI DEM include copper data.  A table of those violations is attached as **Exhibit 5** and incorporated herein by reference.

80.     Plaintiff is unaware of any change to Kenyon's operations or treatment technology that would enable the Facility to comply with its effluent limits for copper.  Unless and until such changes are made, Kenyon will continue to violate its daily maximum and monthly average copper limits.  In a formal written communication to RI DEM on August 27, 2021, Kenyon stated that it is not currently able to meet these limits.

**2011 Consent Agreement**

81.     In February of 2011, RI DEM and Kenyon entered into Consent Agreement RIA-325 ("2011 Consent Agreement"), in which RI DEM agreed not to enforce the copper limits in the 2010 Permit.  A copy of the 2011 Consent Agreement is attached as **Exhibit 6**.

82.     The 2011 Consent Agreement, at Attachment 1, identifies "interim limits" for copper:  a maximum daily limit of 385 ug/l (compared to the 2010 Permit limit of 83.9), and a monthly average limit of 348 ug/l (compared to the 2010 Permit limit of 59.6).

83.    The 2011 Consent Agreement did not amend the 2010 Permit or change the copper limits in the 2010 Permit.

84.    The 2011 Consent Agreement was an exercise of enforcement discretion by RI DEM.

85.    Section 4 of the 2011 Consent Agreement states: "The compliance with the terms of this Agreement does not relieve the Respondent from compliance with any other applicable laws or regulations administered by DEM or any other governmental entity.  This agreement shall not operate to shield the Respondent for liability arising from future activities, as of the date of execution of this Agreement.  Execution of this Agreement is for the sole purpose of resolving AAD case number 10-0001/WRA and does not in any way resolve any compliance issues associated with RIPDES Permit No. RI0000191."

86.    As provided in Section 10 of the 2011 Consent Agreement, DEM agreed to enforce only the "interim limits" for copper until August 1, 2015, which was three months after the Consent Agreement's deadline for Kenyon to complete construction of a wastewater treatment upgrade, which was to be designed to attain compliance with Kenyon's permitted limits for copper (as well as with limits for whole effluent toxicity and various other pollutants).

87.    In a December 16, 2010, response to comments submitted by Kenyon regarding a draft of the 2011 Consent Agreement, RI DEM stated: "Total Copper limits in Kenyon's permit are water quality-based and, as a result, must be met by Kenyon to prevent adverse impacts to aquatic organisms."  A copy of the responses is attached as **Exhibit 7**.

88.    In a December 16, 2010, response to comments submitted by Kenyon regarding a draft of the 2011 Consent Agreement, RI DEM stated: "The Total Copper concentrations in Kenyon's permit (59.6 ug/monthly average and 83.9 ug/l daily maximum) are not excessively

low and, in fact, are being met at other RIPDES permittees with similar operations to Kenyon. Therefore, it is expected that Kenyon will be able to identify a technology that not only achieves significant reductions in Total Copper discharge concentrations, but will allow Kenyon to be able to meet its final permit limits."

**Extension of "Interim" Copper Limits**

89.     Through various agreements and extensions granted to Kenyon, RI DEM declined to enforce the water-quality based limits for copper in the 2010 Permit for the entirety of the period that the 2010 Permit was in effect.

90.     In correspondence to Kenyon dated September 24, 2013, RI DEM extended the "interim limits" for copper contained in the 2011 Consent Agreement.  At Kenyon's request, RI DEM untethered the expiration of the interim copper limits from Kenyon's completion of its wastewater treatment plant upgrade; instead, RI DEM extended the interim copper limits until Kenyon completed "a site-specific copper water-effect-ratio study and, if required, its copper treatability study," with both studies to begin "after the upgraded wastewater treatment plant has been brought on-line."  A copy of the correspondence is attached as **Exhibit 8**.

91.     In or about October 2016, Kenyon completed a wastewater treatment plant upgrade and brought the upgraded plant on-line.

92.     After completion of the wastewater treatment plant upgrade, RI DEM again extended the "interim limits" for copper contained in the 2011 Consent Agreement, by allowing Kenyon to delay initiation of its site-specific copper water-effect-ratio study.  RI DEM untethered Kenyon's initiation of the site-specific copper water-effect-ratio study from the completion of the wastewater treatment plant upgrades, and instead conditioned initiation of the

study on Kenyon first coming into compliance with its permitted limits for whole effluent toxicity. A copy of the correspondence is attached as **Exhibit 9**.

93.     At Kenyon's request, the deadline set by RI DEM for Kenyon to comply with its permitted limits for whole effluent toxicity was extended by RI DEM at least six times between October 2016 and April 1, 2022, the date the 2022 Permit went into effect.

94.     RI DEM agreed that it would enforce only the "interim limits" for copper in the 2011 Consent Agreement, and not the water quality-based limits specified in the Facility's Permit, for the entire period the 2010 Permit was in effect (from October 1, 2010, until March 31, 2022). Wastewater discharged by Kenyon into the Pawcatuck River violated the water quality-based limits for copper during each reporting period that the 2010 Permit was in effect.

## COUNT II:  WHOLE EFFLUENT TOXICITY VIOLATIONS

95.     Paragraphs 1 through 94 are re-alleged and incorporated by reference herein.

96.     "Whole effluent toxicity" ("WET") is a term used to describe the aggregate toxic effect of an aqueous sample, such as industrial wastewater, as measured by a test organism's response upon exposure to the sample. A WET test can be designed measure acute toxic effects, such as lethality, or chronic toxic effects, such as impaired growth or reproduction.

97.     WET tests are a way of measuring the effect on aquatic organisms of exposure to pollutants in an effluent without necessitating the identification of the specific pollutants in that effluent that cause the effect.

98.     Whole effluent toxicity limits in a NPDES (in this case, RIPDES) permit are designed to control the impact and toxicity of effluent discharges. Organisms used in WET tests – such as *ceriodaphnia dubia* (freshwater flea) and *pimephales promelas* (fathead minnow) – are

used as indicators or surrogates for the aquatic community to be protected, to provide a measure of the real biological impact of exposure to harmful pollutants in wastewater.

99.    One type of acute WET test measures "$LC_{50}$" (Lethal Concentration$_{50}$), which is defined as the concentration of wastewater (expressed as a percentage) that causes mortality to 50% of the test organisms under specified conditions.

100.    From October 1, 2010, until March 31, 2022, Section I(A)(10) of the Facility's Permit required that the $LC_{50}$ concentration for the company's wastewater be no less than 100% for the test organisms *ceriodaphnia dubia* and *pimephales promelas.*  That meant that, for each group of test organisms, at least half of the organisms must have survived in an undiluted, 100% strength sample of effluent for Kenyon to comply with this effluent limitation.  If the effluent sample needed to be diluted with "clean" water in order to permit half of the test organisms to survive, that lower percentage of concentration was reported as the non-complying test result. For example, if the effluent sample had to be diluted by 75% to permit half of the test organisms to survive, the result was reported as 25% (as this was the concentration of effluent at which half of the organisms survived).

101.    Section I(A)(10) of the 2010 Permit required that an $LC_{50}$ WET test be performed on separate test groups of *ceriodaphnia dubia* and *pimephales promelas* on a quarterly basis (once every three months), using samples of Kenyon's wastewater taken at Outfall 001A.

102.    During the period beginning June 23, 2017 (the statute of limitations period) and ending March 31, 2022, Kenyon violated the $LC_{50}$ WET test limits in the 2010 Permit as follows:

    a.    A quarterly sample taken on 9/15/2017 measured 61.6% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

b.  A quarterly sample taken on 2/15/2018 measured 70.7% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

c.  A quarterly sample taken on 3/20/2018 measured 95.4% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

d.  A quarterly sample taken on 5/3/2018 measured 68.0% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

e.  A quarterly sample taken on 9/26/2018 measured 36.6% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

f.  A quarterly sample taken on 12/6/2018 measured 40.6% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

g.  A quarterly sample taken on 3/14/2019 measured 29.7% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

h.  A quarterly sample taken on 3/14/2019 measured 35.2% for Whole Effluent Toxicity, LC$_{50}$ (*pimephales promelas*)

i.  A quarterly sample taken on 6/18/2019 measured 63.7% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

j.  A quarterly sample taken on 9/19/2019 measured 23.3% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

k.  A quarterly sample taken on 12/19/2019 measured 36.6% for Whole Effluent Toxicity, LC$_{50}$ (*ceriodaphnia dubia*)

l.  A quarterly sample taken on 12/19/2019 measured 79.5% for Whole Effluent Toxicity, LC$_{50}$ (*pimephales promelas*)

m. A quarterly sample taken on 3/17/2020 measured 68.3% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

n. A quarterly sample taken on 6/3/2020 measured 71.1% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

o. A quarterly sample taken on 9/10/2020 measured 40.6% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

p. A quarterly sample taken on 9/19/2020 measured 25.0% for Whole Effluent Toxicity, $LC_{50}$ (*pimephales promelas*)

q. A quarterly sample taken on 12/9/2020 measured 79.4% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

r. A quarterly sample taken on 3/11/2021 measured 35.4% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

s. A quarterly sample taken on 6/8/2021 measured 68.3% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

t. A quarterly sample taken on 9/21/21 measured 73.6% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

u. A quarterly sample taken on 12/14/2021 measured 68.3% for Whole Effluent Toxicity, $LC_{50}$ (*ceriodaphnia dubia*)

103. Each time Kenyon violates the $LC_{50}$ Whole Effluent Toxicity limit for *ceriodaphnia dubia* or *pimephales promelas* in its RIPDES permit, it violates the CWA.

104. Kenyon violated the CWA with each quarterly Whole Effluent Toxicity sample listed above.

105.    As of April 1, 2022, Section I(A)(10) of the Facility's Permit has required that the $LC_{50}$ concentration for the company's wastewater be no less than 50% for the test organisms *ceriodaphnia dubia* and *pimephales promelas*.  That is, for each group, at least half of the test organisms must be able to survive in effluent diluted to no less than 50% strength.

106.    The WET limits in the 2022 Permit are based on site-specific calculations done by RI DEM.

107.    Kenyon's wastewater effluent would have repeatedly violated the $LC_{50}$WET limits in the 2022 Permit had those limits been in place throughout the statute of limitations period (the period beginning June 23, 2017).

108.    Plaintiff is unaware of any changes in Kenyon's operations or treatment system that would enable it to consistently comply with the $LC_{50}$ WET limits for *ceriodaphnia dubia* and *pimephales promelas* contained in the 2022 Permit.  Unless and until such changes are made, Kenyon will continue to violate the $LC_{50}$ WET test limits in the Facility's Permit after the date this Complaint is filed.  In a formal written communication to RI DEM on August 27, 2021, Kenyon stated that it is not currently able to meet these limits.

**2011 Consent Agreement**

109.    In the 2011 Consent Agreement between RI DEM and Kenyon (attached as **Exhibit 6)**, RI DEM agreed not to enforce the $LC_{50}$ WET test requirements in the 2010 Permit.

110.    Accordingly, Attachment 4 of the 2011 Consent Agreement identified interim "report only" $LC_{50}$ WET test requirements for *ceriodaphnia dubia* and *pimephales promelas*.

111.    The 2011 Consent Agreement did not amend the 2010 Permit or change the $LC_{50}$ WET limits in the 2010 Permit.

112.    The 2011 Consent Agreement was an exercise of enforcement discretion by RI DEM.

113.    Section 4 of the 2011 Consent Agreement states: "The compliance with the terms of this Agreement does not relieve the Respondent from compliance with any other applicable laws or regulations administered by DEM or any other governmental entity.  This agreement shall not operate to shield the Respondent for liability arising from future activities, as of the date of execution of this Agreement.  Execution of this Agreement is for the sole purpose of resolving AAD case number 10-0001/WRA and does not in any way resolve any compliance issues associated with RIPDES Permit No. RI0000191."

114.    As provided in Section 12(b) of the 2011 Consent Agreement, RI DEM agreed to enforce only the "interim" (report only) limits for acute WET until: (a) Kenyon confirmed through a Toxicity Compliance Evaluation Report that it could comply with the $LC_{50}$ WET test requirements contained in the 2010 Permit, or (b) three months after Kenyon completed corrective actions, including wastewater treatment facility upgrades, that allowed it to meet the $LC_{50}$ WET test requirements contained in the 2010 Permit.

115.    In or about October 2016, Kenyon completed a wastewater treatment facility upgrade and brought the plant online.  Pursuant to Section 12(b) if the 2011 Consent Agreement, the upgrade was a corrective action designed to bring the Facility into compliance with WET limits specified in the Facility's Permit.

116.    At Kenyon's request, RI DEM extended the deadline for Kenyon to comply with its toxicity limits at least six times between October 2016, when wastewater treatment facility upgrades were completed, and April 1, 2022, when the 2022 Permit went into effect.

117.    RI DEM agreed that it would enforce only the interim "report only" LC$_{50}$ WET test requirements in the 2011 Consent Agreement, and not the WET limits specified in the Facility's Permit, for the entire period the 2010 Permit was in effect (from October 1, 2010, until March 31, 2022).

## ADVERSE EFFECTS OF THE VIOLATIONS ALLEGED HEREIN

### Copper Violations

118.    In 1977, Congress designated copper as a "toxic pollutant" under the Clean Water Act.

119.    The Pawcatuck River ecosystem is home to 67 species of fish.  Copper can be extremely toxic to fish.  Based on toxicity experiments conducted with diverse fish species, waterborne copper exposure can induce various kinds of organ damage in the gills, liver, kidney, brain, gonad, and heart.  Copper can cause chronic harm as it bioaccumulates in fish tissue, can depress immune system response, and can cause behavioral abnormalities.  *See, e.g.,* Malhotra, Nemi, et al., *Review of Copper and Copper Nanoparticle Toxicity in Fish*, Nanomaterials, 10, 1126 (2020) (www.mdpi/journal/nanomaterials-10-01126).

120.    Copper can also be extremely toxic to other forms of aquatic life.  Even at sub-lethal concentrations, copper can cause serious damage to populations of aquatic invertebrates.

121.    When discharged to a waterway, copper does not degrade; instead, it is assimilated or absorbed in water sediment and aquatic animals.

122.    The copper limits in the Facility's Permit are designed to assure that these adverse effects will not happen.  The degree to which copper is toxic to a particular aquatic species varies with the extent to which the copper is bioavailable and the level of exposure, among other

factors. Even when it is not in a bioavailable form when discharged, copper discharged to a waterway can later become bioavailable.

**<u>Whole Effluent Toxicity Violations</u>**

123. The whole effluent toxicity of a facility's wastewater refers to the aggregate toxic effect on aquatic organisms from all pollutants contained in that wastewater.

124. Violations of whole effluent toxicity limits are an indication that the tested effluent is toxic to, and can cause harm to, aquatic life and/or human health. In general, the greater the degree of the violation, the greater the likelihood and severity of harm.

125. According to the Fact Sheet for the Facility's RIPDES Permit, the imposition of whole effluent toxicity requirements is one way in which RI DEM endeavors to implement the state water quality requirements that freshwaters shall not contain chemical constituents "in concentrations or combinations that could be harmful to humans or fish and wildlife for the most sensitive and governing water class use," Rhode Island Water Quality Regulations at §1.10(D)(1), and that "all waters shall be free of pollutants in concentration or combinations" which "adversely affect the composition of fish and wildlife," "adversely affect the physical, chemical, or biological integrity of the habitat," "interfere with the propagation of fish and wildlife," or "adversely alter the life cycle functions, uses, processes and activities of fish and wildlife," *id.* §1.10(B)(1), as well as the Clean Water Act directive that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited" 33 U.S.C. § 1311(a)(3).

126. The 2.16 mile stretch of the Pawcatuck River that begins at the Kenyon Facility's wastewater outfall and runs downstream from there has been formally designated by the State of Rhode Island as "impaired" for "whole effluent toxicity" and as too toxic to serve as suitable "fish and wildlife habitat." The stretch of the Pawcatuck River immediately upstream of the

Facility's outfall is not designated "impaired" for "whole effluent toxicity." This is a strong indication that Kenyon's violations of its $LC_{50}$ WET limits are having a detrimental impact on the river.

## PLAINTIFF'S MEMBERS ARE HARMED BY KENYON'S VIOLATIONS

127. The Facility straddles the Pawcatuck River approximately two miles downstream of Worden Pond, which abuts the Great Swamp Management Area. Horseshoe Falls and a designated National Forest are located within two miles downstream of the Facility, as are numerous canoe and boat entry ramps. Other recreational and conservation areas, including preserves and designated hunting and fishing areas, are located further downstream.

128. Recreational activities on or near the Pawcatuck River typically include swimming, fishing, kayaking, canoeing, and foraging.

129. Plaintiff Environment Rhode Island has members who live on or near, own property on or near, work on or near, and/or recreate on, near, or in the Pawcatuck River.

130. Plaintiff's members consider the Pawcatuck River to be an important resource, and an aesthetically significant fixture of the area in which they live, and they desire that it be kept as clean, healthy, and vibrant as possible.

131. Plaintiff's members want the Pawcatuck River to have as little pollution in it as possible, and their enjoyment of the river is diminished by their knowledge of its pollution.

132. Plaintiff has members who swim, canoe, kayak, fish, forage, view wildlife, take walks, and/or engage in other activities on, in, and by the Pawcatuck River and surrounding lands downstream of the Facility.

133. Environment Rhode Island member Brad Chisholm lives approximately 1.5 miles from the Facility in Charlestown, Rhode Island. Mr. Chisholm regularly canoes the length of the

Pawcatuck from Warden Pond to the bay. This requires him to canoe directly under the Facility. Mr. Chisholm also hikes, forages, and fishes immediately downstream of the facility. The pollution of the river makes these activities less enjoyable than they otherwise would be.

134. Environment Rhode Island member Theodore Mook was raised in Charlestown and moved back to the town in 2009. He canoes on the Pawcatuck from Warden Pond, underneath the Facility, and to the portage point at Horseshoe Falls, approximately half a mile downstream of the Facility. Mr. Mook swims in the Pawcatuck at a location near his property, about four miles downstream of the Facility, where the river crosses Route 91. He hikes along the Pawcatuck several times a week. The pollution of the river makes these activities less enjoyable than they otherwise would be.

135. Environment Rhode Island members Ryan Bouchard and Emily Schmidt are co-founders of the Mushroom Hunting Foundation, a 501(c)(3) nonprofit organization. They live in Wakefield, Rhode Island. They forage for mushrooms in areas adjacent to the Pawcatuck River and throughout the Wood-Pawcatuck watershed, often while leading classes of amateur foragers. Mr. Bouchard and Ms. Schmidt have each foraged for mushrooms in the areas surrounding the Facility and near the Pawcatuck immediately downstream of the Facility. The pollution of the river makes these activities less enjoyable than they otherwise would be.

136. Plaintiff's members' enjoyment of these and other recreational activities in and around the Pawcatuck River is lessened by their knowledge of the Facility's pollutant discharge violations and by the effects of the Facility's discharges on the river.

137. Plaintiff's members are concerned that Kenyon's Clean Water Act violations pose a threat to public health and to aquatic life and wildlife in and around the Pawcatuck River.

138.     Plaintiff's members who hike on or near the Pawcatuck River are concerned that the pollutants discharged by the Plant negatively affect aquatic life and wildlife in, on, and near the Pawcatuck River, and this infringes on their aesthetic enjoyment of the river and its habitat.

139.     Plaintiff has members who are afraid to eat mushrooms foraged downstream of the Facility because pollutants discharged by the Facility into the Pawcatuck River can be absorbed by mycelium, the fungal structure that produces mushrooms as a fruit.  Mr. Bouchard and Ms. Schmidt are especially concerned because the people they have taught to forage for mushrooms frequently do so along brooks and rivers, and these people may not know about the Facility's toxic discharges to the Pawcatuck.

140.     Plaintiff's members want to preserve the aquatic life and wildlife in, on, and near the Pawcatuck River to the greatest extent possible, and for this reason they want as little pollution in the river as possible.

141.     The ongoing actual and threatened harm to Plaintiff's members would be redressed by an injunction, penalty, or other relief that prevents or deters further violations of the Kenyon Facility's RIPDES Permit and/or that remediates harm that has already been caused to the Pawcatuck River and its environs by Kenyon's violations.

## **RELIEF REQUESTED**

Plaintiff requests that this Court:

a. Declare Defendants Kenyon and BCI to have violated and to be in continuing violation of the Clean Water Act and the Facility's RIPDES permit by committing (i) each of the violations described above in Counts I and II, (ii) all subsequent violations of the same type that occurred before the filing of this Complaint, and (iii) all that occur after the filing of this Complaint;

b.  Determine the number of days of violation committed by Defendants;

c.  Order Defendants to comply with the Clean Water Act and the Facility's RIPDES permit, and to refrain from further violations of the effluent standards and limitations at issue in this action;

d.  Order Defendants to implement measures to remedy, mitigate, or offset the harm to the environment caused by the violations alleged above;

e.  Assess an appropriate civil penalty against Defendants for each day of violation of the Clean Water Act and the Facility's RIPDES permit, as provided by 33 U.S.C. §§ 1319(d) & 1365(a);

f.  Award Plaintiff its costs of litigation (including reasonable attorney and expert witness fees), as provided by 33 U.S.C. § 1365(d); and

g.  Order such other relief as the Court deems appropriate.

Dated:  August 23, 2022                    ATTORNEYS FOR PLAINTIFF:

*/s/ Matthew J. Donohue*
Matthew J. Donohue
Joshua R. Kratka
Charles C. Caldart
*Pro hac vice motions to be filed*
National Environmental Law Center
294 Washington Street, Suite 500
Boston, MA 02108
(617) 747-4304 (phone)
mdonohue@nelc.org

*/s/Kevin J. McAllister*
Kevin J. McAllister, #2641
Brennan, Recupero, Cascione, Scungio &
McAllister, LLP
362 Broadway
Providence, Rhode Island 02909
(401) 453-2300 (phone)
(401) 453-2345 (fax)